No. 99,645

In the Matter of MICHAEL C. ALLEN, *Respondent*.

(188 P.3d 953)

Opinion filed July 25, 2008.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the formal complaint for petitioner.

*Michael C. Allen*, respondent, argued the cause pro se.

*Per Curiam*: This is an original uncontested proceeding in discipline filed by the Disciplinary Administrator's office against Respondent Michael C. Allen, an attorney licensed to practice law in Kansas since 1992. Respondent's last registration address with the Clerk of the Appellate Courts of Kansas was in Manhattan, Kansas; he currently resides in Liberal, Kansas.

The formal complaint charged Respondent with violating Kansas Rules of Professional Conduct (KRPC) 1.3 (2007 Kan. Ct. R. Annot. 398) (diligence); KRPC 1.4 (2007 Kan. Ct. R. Annot. 413) (communication); KRPC 1.15 (2007 Kan. Ct. R. Annot. 473) (safekeeping property); KRPC 1.16(d) (2007 Kan. Ct. R. Annot. 487) (terminating representation); and KRPC 3.2 (2007 Kan. Ct. R. Annot. 503) (expediting litigation).

Respondent has stipulated to the facts contained in the formal complaint, stipulated to the rule violations, and concurred in the recommendation of the Disciplinary Administrator. The panel filed its final hearing report on November 15, 2007, and Respondent took no exceptions to it.

Our standard is well-established and oft-cited:

"In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties, and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. [Citation omitted.] Any attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. [Citations omitted.]

"This court views the findings of fact, conclusions of law, and recommendations made by the disciplinary panel as advisory, but gives the final hearing report the

same dignity as a special verdict by a jury or the findings of a trial court. Thus, the disciplinary panel's report will be adopted where amply sustained by the evidence, but not where it is against the clear weight of the evidence. [Citations omitted.]" *In re Lober*, 276 Kan. 633, 636-37, 78 P.3d 442 (2003).

Respondent was admitted to practice on April 24, 1992. In early February 2006, Respondent abandoned his solo immigration law practice suddenly, leaving many clients in the lurch. On October 11, 2006, this court suspended the Respondent's license to practice law in the state of Kansas because the Respondent had failed to pay the attorney registration fee for 2006 and comply with annual continuing legal education requirements. His license remains suspended.

The facts giving rise to this proceeding stem from Respondent's dealings with one client couple: A.R. and H.R. On April 1, 2005, A.R. retained Respondent to initiate the paperwork necessary for the United States Immigration and Naturalization Service (INS) to grant permanent legal resident status for her husband. Initially, the couple paid Respondent $800. Respondent filed a form I-130 on H.R.'s behalf. On October 17, 2005, the couple received notice from the INS that the first round of paperwork had been received and approved.

The couple then contacted Respondent's office to determine what the next step would be. Respondent's legal assistant advised them that they would need to pay an additional $1600 in attorney fees and $575 to cover the costs of filing forms I-485, I-765, and I-864 with the INS.

Because the couple did not have $2175, H.R. approached his employer about borrowing money to pay Respondent. The employer loaned H.R. $1000 for the fees and H.R. provided the title of his vehicle as collateral. Thereafter, H.R. paid his employer back by having $150 deducted from his weekly paycheck.

On November 21, 2005, the couple provided the $1000 to the legal assistant, at which time she said that they needed to provide copies of their tax returns. Respondent deposited the $1000 in his business operating account and converted the money to his personal use. Respondent did not deposit the unearned $1000 fee into a client trust account, as required pursuant to KRPC 1.15(d).

On December 8, 2005, A.R. provided the legal assistant with a copy of the couple's tax returns, and the legal assistant instructed A.R. to wait for a telephone call. After 2 weeks had passed without news, A.R. called to check the status of the representation. The legal assistant instructed A.R. that form I-797 required A.R. and H.R. to wait 90 days before contacting the National Visa Center. Additionally, the legal assistant told A.R. and H.R. that they would need to provide a copy of their 2005 income tax returns after the first of the year.

After those returns were completed on February 27, 2006, A.R. contacted Respondent's office and was told that neither Respondent nor his legal assistant was still working there. The couple later learned that, although Respondent was no longer employed in the office, the legal assistant was. She made arrangements for the couple to retrieve their personal property from Respondent's file, including a birth certificate.

From March 6, 2006, through April 21, 2006, Respondent was hospitalized for treatment of post-traumatic stress disorder. Since Respondent's release from the hospital, and as of the date of the panel's report, he has been under the care of a psychologist. He participates in weekly therapy.

In a letter dated April 24, 2006, that Respondent sent to his clients, he stated:

"Please note that due to health problems I will no longer be able to practice law. As of February 24, 2006, I will be retired. Effective this date I will not be able to answer any questions about your case or give any legal advice.

"If you need further legal advice or legal representation in this case, you will need to hire another attorney.

"My office is now permanently closed. My mailing address is found in the letterhead above."

On April 9, 2007, Respondent provided A.R. and H.R. with $1087, representing the $1000 paid on November 21, 2006, and approximately 6.5 percent interest. On August 3, 2007, Respondent forwarded $200 more to the couple. At the September 27, 2007, hearing on this matter, Respondent agreed to provide them with an additional $513.

Based on its findings, the hearing panel unanimously concluded that Respondent violated KRPC 1.3, which requires lawyers to act with reasonable diligence and promptness in representing their clients. The panel concluded that Respondent failed to diligently represent A.R. and H.R. when he failed to work on obtaining permanent legal resident status for H.R.

The hearing panel unanimously concluded that Respondent also violated KRPC 1.4(a) when he failed to provide A.R. and H.R. information regarding their representation. That rule requires a lawyer to "keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." 2007 Kan. Ct. R. Annot. 413.

KRPC 1.15 requires attorneys to safeguard client's property, and subsection (a) of that rule provides:

"A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation." 2007 Kan. Ct. R. Annot. 473-74.

Respondent deposited the $1000 he received from A.R. and H.R. into his operating account and thus violated KRPC 1.15(a) when he failed to keep the $1000 separate from his own funds. Additionally, Respondent took the $1000 and converted it to his personal use. The panel therefore concluded that Respondent violated KRPC 1.15(a).

KRPC 1.16(d) provides:

"Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law." 2007 Kan. Ct. R. Annot. at 488.

The panel concluded that Respondent abandoned his practice and, in doing so, abandoned representation of A.R. and H.R. He

failed to take any steps necessary to protect them; therefore, Respondent violated KRPC 1.16(d).

KRPC 3.2 requires an attorney to make reasonable efforts to expedite litigation consistent with the interests of the client. Here, the panel concluded the Respondent failed to expedite H.R.'s permanent residency case in violation of KRPC 3.2.

In recommending discipline, the panel considered the following factors based on the American Bar Association's Standards for Imposing Lawyer Sanctions (1991 ed.) (Standards):

"*Duty Violated*. The Respondent violated his duty to his client to provide diligent representation and adequate communication. Additionally, the Respondent failed to safeguard his clients' funds.

"*Mental State*. The Respondent knowingly violated his duties.

"*Injury*. As a result of the Respondent's misconduct, the Respondent caused actual harm to his clients."

The panel found the following aggravating factors present:

"Multiple Offenses. The Respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.15(a); KRPC 1.16(d), and KRPC 3.2. As such, the Respondent committed multiple offenses.

"Vulnerability of Victim. [A.R. and H.R.] were particularly vulnerable to the Respondent's misconduct.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1992. At the time the Respondent engaged in misconduct, the Respondent had been practicing law for a period of 14 years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct."

The panel also considered the following mitigating factors:

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined.

"Absence of a Dishonest or Selfish Motive. Dishonesty and selfishness were not motivating factors in this case.

"Personal or Emotional Problems if Such Misfortunes have Contributed to a Violation of the Kansas Rules of Professional Conduct. The Respondent suffers from post-traumatic stress disorder. He had been receiving treatment for this disorder for more than 10 years. In February, 2006, his psychologist wrote a letter in an attempt to increase his service related disability. In the letter, his psychologist stated:

'. . . . It is my opinion that these symptoms are severe and do cause clinically significant distress and impairment in many areas of his life, including employability. Until recently, Mr. Allen has attempted to function as a practicing attorney. Several weeks ago, he made the final decision to close his law practice—something that he has been considering for some time. In my work with him, I have observed his attempt to manage the symptoms associated with his PTSD as they impact his vocation. However, his symptoms have often interfered . . . in significant ways with his work. The extent of his depression and anxiety had diminished his ability to effectively interact with clients and function in courtroom settings. His hypervigilance and paranoia have limited the extent to which he feels able to interact comfortably with others. He is fearful of confrontations and emotional arousal, and often avoids situations for fear that he will react in violent ways. I do concur that the intensity of his PTSD is such that it severely limits his ability to function effectively in his vocation, and support his decision to terminate his law practice.

'Results from the psychological testing support the extent to which Mr. Allen is impaired by his PTSD. Findings reveal that Mr. Allen struggles with severe depression and anxiety. His coping resources have been overwhelmed, and he is given to agitation and impulsivity. Some difficulties in thinking are noted, as scattered ideation and circumstantial reasoning may compromise the quality of his judgment. Data further indicates that Mr. Allen harbors intense feelings of anger and, while attempting to employ intellectualization as a defense, may have episodes of explosive emotion. He is chronically tense and ruminative, and may be given to obsessive-compulsive behaviors.

'In general, I believe Mr. Allen to be a severely depressed and anxious man, whose PTSD symptoms are chronic and severe. These symptoms significantly impact the ways in which he is able to function in many settings. He has experienced significant difficulties in his ability to cope with the stressors associated with employment. It is my opinion that, at this time, Mr. Allen's ability to work is significantly compromised by these issues. I do not believe he is capable of working now or in the foreseeable future. Further, there is evidence that return to work would likely further exacerbate his symptomology.'

Additionally, in January, 2007, his primary therapist from his 2006 inpatient stay wrote a letter regarding the Respondent's ability to function as an attorney. In that letter, the psychologist stated:

'Mr. Allen struggles with chronic Post-Traumatic Stress Disorder as a result of his combat experience in Vietnam. He is also diagnosed with Major Depressive Disorder secondary to the PTSD. During this treatment he worked on combat related issues. He also focused on his ability and inability to cope with stress, particularly the stress resulting in his practicing law. Mr. Allen has a great deal of difficulty with the pressure he experiences from his law practice. He had attempted to scale down the work that he accepted, but was still running into problems. He had problems with memory, concentration, and focus. We talked a number of times about the wisdom of his leaving this oc-

cupation due to the problems he was having. It was my opinion that the stress of practicing law was too great for him and that he would be better off leaving his profession. . . . '

It is clear to the Hearing Panel that the Respondent's mental illness contributed to the Respondent's misconduct.

"The Present and Past Attitude of the Attorney as Shown by the Respondent's Cooperation During the Hearing and the Respondent's Acknowledgment of the Transgressions. The Respondent fully cooperated in the disciplinary process as exhibited by his complete acknowledgment of the misconduct."

In assessing the appropriate discipline, the panel considered the following two Standards:

" 'Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.' Standard 4.12.

" 'Suspension is generally appropriate when:
(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or
(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.' Standard 4.42."

The Disciplinary Administrator recommended that Respondent be indefinitely suspended. Additionally, the Disciplinary Administrator recommended that, within 60 days of issuance of the report, the Respondent be required to cull through his files, create a complete list of his clients at the time he abandoned his practice, and determine to whom he may owe unearned fees. The Respondent concurred in the Disciplinary Administrator's recommendation. The panel unanimously adopted the recommendation that Respondent be indefinitely suspended, that he compile a complete list of clients in order to determine who may still be owed unearned fees, and that he forward the list to the Disciplinary Administrator. The panel also recommended that the start date of Respondent's indefinite suspension be retroactive to the date of his administrative suspension.

At argument before this court, on May 13, 2008, the Disciplinary Administrator acknowledged receipt of such a list, indicating that Respondent had provided 67 names. The Disciplinary Administrator also noted that Wyandotte County District Judge Philip L. Seive had appointed an attorney for the clients abandoned by Respon-

dent, and this attorney, with the help of Respondent's legal assistant, had compiled a list that contained 30 additional names. The Disciplinary Administrator has written to all 97 of these clients, informing them of the status of the disciplinary case; offering assistance in finding legal counsel; and requesting claims for fees paid to but unearned by Respondent. Unfortunately, perhaps in part because of the nature of Respondent's heavy immigration law practice and the heightened vulnerability of his clientele, many of these letters generated no response. As of the date of argument, at least 21 were returned as undeliverable. According to Respondent's accounting, approximately $34,000 in unearned legal fees remains outstanding.

While the panel's recommended discipline is advisory only and it is the responsibility of this court to examine the evidence and determine for itself the discipline to be imposed, *In re Gribble*, 261 Kan. 985, 986, 933 P.2d 672 (1997), the hearing panel's report is due the same dignity as a special verdict by a jury or the findings of a trial court. Thus, the disciplinary panel's report will be adopted where amply sustained by the evidence, but not where it is against the clear weight of the evidence. *In re Lober*, 276 Kan. 633, 636-37, 78 P.3d 442 (2003).

Here, the majority's report and recommendation is amply sustained by the evidence. Respondent stipulated to the facts and violations alleged, took no exceptions to the report, and concurred in the proposed discipline. We adopt the hearing panel's findings of fact and its conclusions of law as our own. With regard to the appropriate sanction, we note that Respondent's conduct probably has had immeasurable negative effect on individuals peculiarly dependent on his expertise. However, we agree that there is strong evidence of mitigation for Respondent's conduct. Respondent served the United States in the Vietnam War. As a result of his experiences in the military, he was diagnosed with post-traumatic stress disorder, which became acute in 2006, requiring a 7-week hospital stay. He has taken inactive status from law practice; he is making efforts in conjunction with the office of the Disciplinary Administrator to repay unearned fees; and he remains under the care and treatment of mental health professionals employed by the

Department of Veterans Affairs. We unanimously agree with the panel's recommended discipline of indefinite suspension, which will take effect as of the date of this order. We find no compelling reason to date the suspension retroactively to the time of Respondent's administrative suspension.

IT IS THEREFORE ORDERED that Michael C. Allen be and he is hereby indefinitely suspended in accordance with Supreme Court Rule 203(b) (2007 Kan. Ct. R. Annot. 261) for the violations of KRPC 1.3, 1.4, 1.15(a), 1.16(d), and 3.2.

IT IS FURTHER ORDERED that this opinion be published in the Kansas Reports and that the costs of these proceedings be assessed to Respondent.